## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

In re                                              :      Chapter 13

JOSEPH G. SOPPICK                                  :
JANET A. SOPPICK
            Debtors                                :      Bankruptcy No. 13-16045

.................................................

## MEMORANDUM

.................................................

Three contested matters are presently before me, and they are related. The Borough of West Conshohocken (Borough), which holds an allowed secured claim against the debtors, seeks dismissal of their chapter 13 case. The Borough also seeks relief from the automatic stay to execute upon its state court judgment against these debtors. The debtors not only oppose any relief sought by the Borough, they seek relief from the bankruptcy stay to prosecute a state court appeal from the Borough's judgment against them, albeit with the stay remaining in place against the Borough.

Evidentiary hearings have been held over four days, posthearing memorandum have been submitted, and these contested matters are ripe for determination. As will be discussed, these motions are just the latest disputes between these parties since they began in 1996.

I.

The following facts were proven at trial and will be set forth in narrative form.

The Borough's secured claim arises from a judgment entered against the debtors in the Montgomery County Court of Common Pleas, dated March 18, 2013, and in the amount of $130,500.00.  See ex. M-3.  The seeds for this judgment were planted in June 1996, when the debtors filed a permit application with the Borough to construct an attached garage on their property located on Moir Avenue in West Conshohocken Borough, Pennsylvania.  See Soppick v. Zoning Hearing Board of the Borough of West Conshohocken, 2008 WL 9405108, at *1 (Pa. Cmwlth. Feb. 19, 2008).

Although the debtors' initial permit request was denied, an amended permit request was granted.  In June 1996, the debtors received permission from the Borough to construct a one-story, detached, 950 square-foot garage, with a breezeway connecting the garage to their residence.   They were directed to complete this construction by the end of 1997.  Id., at *1.

In April 1999, the debtors' property was inspected by a zoning officer who found that the debtors were then constructing a 1173 square-foot, two-story, attached garage, and not the structure that had been authorized in 1996.  Upon observing the non-conforming nature of the building, the zoning officer then issued a cease and desist order with the possibility of fines as a sanction.  Id., at *1.  Thereafter, over the years the debtors, without success, challenged this cease and desist order, the initial $7,038.50 fine, see ex. M-27, as well as the subsequent $300 per day fine issued on June 19, 2007, in the Borough Council, the Borough's Zoning Hearing Board, in the Pennsylvania Court of Common Pleas, in Pennsylvania's Commonwealth Court, in Pennsylvania's Supreme Court, in the District Court for the Eastern District of Pennsylvania, and in the Third Circuit Court of Appeals.  See 2004 WL 739945 (E.D. Pa. Mar. 8, 2004); 118 Fed. Appx.

2

631 (3d Cir. 2004); 902 A.2d 1025 (Pa. Cmwlth. 2006); 590 Pa. 671 (2006); 943 A.2d

1028 (Pa. Cmwlth. 2008); 2008 WL 9405108 (Pa. Cmwlth. Feb. 19, 2008); see also exs.

M-4 (state court opinion dated May 2, 2013); M-27 (with attachments).[1]

      In the latest state court ruling against the debtors, the Montgomery County

Court of Common Pleas concluded in March 2013 that the debtors had accrued 435 days

of fines, at $300 per day, before they cured the aforementioned zoning violation.  Based

upon Pennsylvania's Municipalities Planning Code, specifically 53 P.S. § 10617.2(a), the

state court entered judgment in favor of the Borough on March 18, 2013.  Exs. M-3, M-4.

The debtors then filed another appeal to the Commonwealth Court on April 5, 2013,

which appeal is still pending.  See ex. M-2; M-31.

      As the debtors had not requested a stay pending appeal of this monetary

judgment, nor posted a supersedeas bond, the Borough began execution proceedings and

scheduled a sheriff sale of the debtors' Moir Avenue realty for July 31, 2013.  Ex. M-5.

To prevent that sale from occurring, the debtors filed the above-captioned chapter 13

bankruptcy petition on July 9, 2013.  N.T., June 25, 2014, at 9:44[2]; see exs. M-6, M-9.

That filing stayed both the Borough's scheduled execution sale as well as the debtors'

Commonwealth Court appeal from the judgment.  See 11 U.S.C. § 362(a); see also, e.g.,

---

[1]The federal court litigation was brought under 42 U.S.C. § 1983, based upon the debtors' contention that the Borough's "stop work" order was "in retaliation for their public accusations of misconduct by the Mayor."  Soppick v. Borough of West Conhohocken, 118 Fed. Appx. 631, 633 (3d Cir. 2004).  That claim was not successful.

[2]The parties elected not to order an actual transcript of the dismissal hearings that took place over four days.  Therefore, I will refer to the digital audio recording of the hearings, and will identify the date, hour and minute at which the particular testimony took place.

Taylor v. Slick, 178 F.3d 698 (3d Cir. 1999); Association of St. Croix Condominium

Owners v. St. Croix Hotel Corp., 682 F.2d 446, 448-49 (3d Cir. 1982).

At the time of their bankruptcy filing, the debtors disclosed that their

combined monthly income was only $1,088, with monthly expenses of $1,627.95.  See

ex. M-8 (including Bankruptcy Schedules I & J, filed August 8, 2013).  This income was

derived from Mr. Soppick's work as a self-employed mechanic and Mrs. Soppick's

workers' compensation payments.  Id.  The debtors also disclosed, inter alia, that they had

a personal injury lawsuit pending in state court, of "unknown" value.  Id. (Bankruptcy

Schedule B, #21, filed on August 8, 2013).

On August 8, 2013, the debtors filed a proposed chapter 13 plan that called

for them to make 48 monthly payments of $200 through August 2017, for a total of

$9,600, plus a lump sum payment in September 2017 "to pay off the remaining balance of

the Chapter 13 payment."  Ex. M-9, at 1.  This proposed plan stated that the debtors "will

pay the entire allowed claim of the Boro [sic] of West Conshohocken, as ultimately

determined by the Court through claim litigation, from payments to the Trustee."  Id., at

2.  The source of that lump sum payment was not specified in this proposed plan, nor was

the amount to be paid.  Id.

The chapter 13 trustee, the Borough, Wells Fargo Bank and the Internal

Revenue Service filed objections to the confirmation of this plan.  Ex. M-7 (docket

entries ##40, 41, 48, 49); ex. M-10.  After numerous postponements, a confirmation

hearing was held on April 1, 2014, at which time confirmation of the August 2013 plan was denied. Ex. M-7 (docket entry #53).[3]

       After confirmation was denied in April 2014, the disputes in this court between the debtors and the Borough became numerous. The Borough sought an examination of the debtors under Bankruptcy Rule 2004, which the debtors opposed. Ex. M-7 (docket entries ##50, 62). The debtors filed the instant motion for "limited" relief from the bankruptcy stay under section 362(d)(1), requesting that they be permitted to prosecute their appeal of the March 18, 2013 judgment in the state Commonwealth Court, albeit while the stay remained in place against the Borough in order to prevent that creditor from executing upon its judgment. The Borough opposed such relief. See ex. M-7 (docket entries ##57, 61). The Borough countered with its own lift-stay motion, now also pending, to which the debtors objected. Id. (docket entries ##73, 96).

       The Borough discovered that on May 22, 2014, the debtors filed a petition in the state Court of Common Pleas to stay the Borough's prepetition writ of execution "pending the completion of the bankruptcy, the completion of the personal injury action, and the appeal filed in this matter." Ex. M-25. The "personal injury action" concerns a state court lawsuit brought by the debtors against Emergency One, Inc.[4] The Borough

---

      [3]I take judicial notice, under Federal Rule of Evidence 201 (incorporated into bankruptcy cases by Federal Rule of Bankruptcy Procedure 9017), of the docket entries of this case and the authenticity of the documents filed of record. See Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1200 n.3 (3d Cir. 1991); Levine v. Egidi, 1993 WL 69146, at *2 (N.D. Ill. 1993); In re Paolino, 1991 WL 284107, at *12 n.19 (Bankr. E.D. Pa. 1991); see generally In re Indian Palms Associates, Ltd., 61 F.3d 197 (3d Cir. 1995).

      [4]This lawsuit will be discussed below.

orally moved to strike this state court petition as violative of the bankruptcy stay, which request was granted.  See docket entry #103.

The debtors also filed a motion to avoid the Borough's judicial lien under section 522(f), which was opposed by the Borough.  Id. (docket entries ##85, 97).  In addition, the debtors filed an objection to the Borough's proof of claim, to which objection the Borough responded.  Id. (docket entries ##100, 132).  The Borough also filed the instant motion to dismiss this chapter 13 case.

On May 12, 2014, the debtors filed amended bankruptcy schedules pursuant to Bankruptcy Rule 1009(a), disclosing that in March 2014, Mr. Soppick became employed and that Mrs. Soppick was receiving a monthly "contribution from daughter." Ex. M-21 (Amended Bankruptcy Schedule I).  The debtors averred that in May 2014, their monthly income was now $6,293.23, and their monthly expenses were $5,593.95. Id. (Amended Bankruptcy Schedules J).

At a hearing on this contested matter, however, Mrs. Soppick acknowledged that, prior to May 2013, she stopped receiving monthly workers compensation payments because she accepted a $34,000 lump sum award.  N.T., June 24, 2014 at 4:23-4:28; see also ex. M-21, (Amended Statement of Financial Affairs, #4).  As Mr. and Mrs. Soppick have been separated at least since the date of their bankruptcy filing, see ex. M-11 (their bankruptcy petition lists separate addresses), with Mrs Soppick residing in the Moir Avenue property, she uses her lump sum award to pay her current monthly expenses (but not her mortgage payments, as they are to be paid by Mr. Soppick) and was unwilling to use that money to fund a chapter 13 plan.  N.T., June 24, 2014 at 4:28.  Thus, the debtors' actual current combined monthly income does not include the

6

$1,509 of workers compensation funds erroneously listed on their May 2014 amended Schedule I.  See ex. M-21.   Furthermore, no evidence was offered regarding the amount of this lump sum award that remained unspent by Mrs. Soppick as of June 24, 2014, when she testified.

Hence, the debtors' combined monthly income, as reported on their amended schedule of income, but excluding any monthly workers compensation payment, is approximately $4,785, which is less than their combined monthly expenses.  Mr. Soppick testified that his employment income is understated on his amended bankruptcy schedule, because he expects to be earning overtime pay—as much as $350.00 per week extra—although such overtime work is not guaranteed.  See N.T., June 25, 2014, at 9:15; July 3, 2014, at 9:32.  He also hopes to increase his self-employment income.

I note, however, that he disclosed self-employment earnings of only $2,120 for 2012 and $3,020.27 for the prepetition period of 2013 on his initial and amended Statements of Financial Affairs.  See ex. M-8; M-21.  Mrs. Soppick testified that she has applied for social security disability payments, but her application was initially denied and no  hearing had been scheduled on her pending appeal.  N.T., June 24, 2014, at 4:16-4:28. She did not specify the nature of her alleged disability; nor was evidence offered concerning the likelihood of her success on appeal, or the amount of her disability claim.

After filing their amended bankruptcy schedules in May 2014 , the debtors also filed an amended chapter 13 plan.  Its material terms concerning payments due under this proposed amended plan are as follows:

2. PLAN FUNDING AND LENGTH OF PLAN;

A. During the ten (10) month period from August 2013, through May, 2014, $200.00 per month;

7

B. During the five (5) month period from June, 2014, through October, 2014, $600.00 per month;

C. During the forty-five (45) month period from November, 2014 through July, 2018, $1,200.00 per month; if the Husband-Debtor's business increases significantly above its former net earnings of about $500,00 per month, the Debtors will move the Court to modify their Plan after confirmation to increase the monthly plan payments, thereby reducing or eliminating the amount of the  payment to be made under subparagraph D below;

D. On or before August 8, 2018, a lump sum payment from the husband-Debtor's damage award or settlement in his personal injury/product liability action in the amount of $10,700.00 to pay off the remaining balance of the allowed priority and secured claims.

E. The total base amount to be paid through the plan shall be: $69,700.00.

Ex. M-24, ¶ 2, at 1.  Mr. Soppick had made two payments of $600.00 to the chapter 13 trustee as of the date of the June 25th hearing on the motion to dismiss this case.  See ex. M-30.

In addition, the debtors' May 2014 amended plan proposed to pay: $9,251.19 to cure a mortgage arrearage owed to Wells Fargo Bank, N.A., holder of a mortgage on the debtors' Moir Avenue realty; a commission to the chapter 13 trustee, currently set at 8% but not to exceed 10%; attorney's fees to debtors' counsel of $4,376.00; payment in full to creditors holding priority claims (IRS has a priority claim in the amount of $4,538.43); and, in essence, no distributions to general unsecured creditors. Id., ¶¶ 3-5 at 2-3.  General unsecured creditors have filed claims totaling approximately $23,000.  See Proof of Claims Register.

At the time of the debtors' bankruptcy filing they were current in mortgage payments to Wells Fargo Bank, and thus their initial, August 2013, proposed chapter 13

8

plan did not provide for any arrearage payments to that creditor.  See ex. M-9.  After the

chapter 13 case commenced, Mr. Soppock intentionally stopped making mortgage

payments in the hope that the debtors could qualify for a loan modification if their loan

were delinquent.  N.T. June 25, 2014, at 10:26-27.  There was no evidence that such a

mortgage loan modification occurred.

Insofar as the secured claim of the Borough is concerned, the amended

proposed plan filed in May 2014 stated:

> In the course of this case, the Debtors will pay the entire
> allowed claim of West Conshohocken Borough, as ultimately
> determined by the Court through claim litigation (which in
> turn would be based upon a ruling of the Pennsylvania
> Commonwealth Court in the case Soppick v. Borough of
> West Conshohocken 571 C.D. 2013, possibly followed by
> remand to the Montgomery County Court of Common Pleas
> and revised decision in the lower court), motion to avoid
> judgment lien, and/or an adversary proceeding pursuant to 11
> U.S.C. §506, through payments to the Trustee under the
> Chapter 13 Plan.

Id., ¶3(B), at 2.  Upon completion of the debtors chapter 13 plan, the Borough would be

required to mark its judgment against them as satisfied.  Id.

Thus, the May 2014 plan provided for payments to only three creditors:

Wells Fargo, the IRS, and the Borough.

The reference in the debtors' proposed May 2014 amended plan to a

"personal injury/product liability" action concerns the aforementioned state court

litigation brought by the debtors against an entity known as Emergency One, Inc.  Ex. M-

1.  This lawsuit was based upon injuries Mr. Soppick suffered as a volunteer fire fighter

in 2005, and was filed in state court on June 3, 2007.[5]  This litigation has not been

scheduled for trial, ex. M-1, and was listed on the debtors' original and twice amended

Bankruptcy Schedule C as an exemption claim under sections 522(d)(5) and (d)(11)(D),

with the value of the exemption at "$0.00," and the value of the litigation claim as

"unknown."  Exs. M-7, M-21; docket entry #139.

        The debtors' offered testimony from the attorney who represents them in

both their product liability/personal injury lawsuit and in their appeal from the March 18,

2013 state court judgment against them.  See ex. M-26.  As to the latter, he explained that

the debtors' are challenging the March 18th judgment because it includes daily fines for

the period of time that their unsuccessful appeal of the order imposing the $300 per day

fine was pending in the Commonwealth Court.  See ex. M-4.  He also acknowledged,

however, both in the Court of Common Pleas and in the notice of issues raised on appeal

with the state appellate court that the debtors have conceded they are liable for fines from

the date the Commonwealth Court denied their appeal to the date the zoning violation was

corrected: from February 19, 2008 until August 27, 2008, id., at 2-3; ex. M-26, ¶ 15, at 2,

which fines counsel estimated would total about $60,000.  N.T. July 3, 2014 at 1:52.

        Mr. Soppock does not agree with his own attorney's legal position on

appeal.  He believes that the state court's entry of summary judgment in March 2013 was

erroneous, and that he should be afforded the opportunity to demonstrate that the fines

awarded were excessive and the amount he owes the Borough is actually less than even

$60,000.  N.T. June 25, 2014 at 9:48-50.  His attorney, though, recognizes that the

---

[5]Mr. Soppick also unsuccessfully sued the Borough based upon these injuries
under the Pennsylvania Heart and Lung Benefits Act.  See Soppick v. Borough of West
Conshohocken, 6 A.3d 22 (Pa. Cmwlth. 2010).

debtor's belief is inconsistent with the legal position taken on his behalf.  N.T. July 3,
2014 at 2:01-02.

       As just noted, the sole issue raised by the debtors in their appeal from the
March 2013 judgment is whether the daily fines were stayed while their Commonwealth
Court appeal was pending, even though the debtors never requested such a stay from any
state court.  According to debtors's counsel, their legal contention is that 53 P.S. §
10617.2(b) granted them an automatic stay of the daily fines while they appealed the
order fixing the fines, even though they did not petition for a stay.[6]  N.T. July 3, 2014 at
1:51.

       As concerns the former tort lawsuit, debtors' counsel testified that he
brought suit on their behalf in January 2007, against the manufacturer of the fire truck
used by the volunteer fire department on the date Mr. Soppick was injured.  See ex. M-1.[7]
Mr. Soppick was injured when water from a hose connected to the fire truck, see exs. D-
1— D-3, knocked him to the ground, resulting in his hospitalization and subsequent
rehabilitation treatments.  See ex. D-4, at 6.  In their state court lawsuit, the debtors
allege, with support from a report prepared by an individual they maintain is an expert,
that the defendant manufactured the fire truck, and that the truck should have been fitted
with a visible shut-off value at the rear hose connection point.  Id., at 9.  The debtors'

_____

       [6]53 P.S. § 10617.2(b) states:

       (b) The court of common pleas, upon petition, may grant an order
       of stay, upon cause shown, tolling the per diem fine pending a final
       adjudication of the violation and judgment.

       [7]Counsel thought that the Borough had been dismissed from this litigation on the
grounds of sovereign immunity, but the state court docket entries do not reflect that the Borough
had been named as a defendant.

expert opined that the failure to have such an external shut-off valve (or clear warning signs) was a defect in the manufacture of the truck that resulted in Mr. Soppick's injuries. Id.

The defendant in that litigation, represented by its insurance carrier, and relying upon three reports by individuals it maintains are experts, counters that the truck was designed properly and that any injuries suffered were caused solely by human error committed by those fire fighters present at the scene and operating the truck and the hose. See ex. D-5; N.T., July 11, 2014 at 10:01-02.  Moreover, the defendant maintains that it offers shut-off valves as a purchase option, but that option had been declined when the fire truck involved in Mr. Soppick's accident was purchased.  Id.

The debtors' state court counsel further testified that if the defendant were found liable at trial, the debtors intend to seek damages for medical bills, lost wages, loss of consortium, and pain and suffering.  He estimated a trial demand for economic damages of approximately $350,000, N.T., July 3, 2014 at 12:39, and a demand of about $1 million inclusive of economic and non-economic damages, N. T., July 3, 2014 at 12:36, which is within the scope of the defendant's insurance coverage.  N.T., July 3, 2014 at 12:44; July 11, 2014 at 10:12; see also ex. D-6, at 1.  However, because Mr. Soppick had received payments under the state workers compensation statute toward his medical bills and lost wages, there is a subrogation lien in the amount of $412,501.71 on any damages he would recover.[8]  See ex. D-6, at 1; see also N.T., July 3, 2014 at 12:34-

---

[8]Debtors' counsel did not make clear precisely who held the subrogation lien pursuant to state law such as 77 P.S. § 671: a governmental entity, such as the Workers Compensation Bureau; a former employer of the Mr. Soppick; or the insurer of the former employer,.  He simply identified the lien as an "EMC Lien."  Ex. D-6, at 1. For purposes of this

(continued...)

35; July 11, 2014 at 9:54.  To the extent that this lawsuit yields a recovery, the lienholder is responsible for payment of its pro rata share of counsel fees and costs.  N.T., July 11, 2014 at 9:57.

The debtors have agreed to compensate state court counsel with a one-third contingency fee, plus payment of litigation costs.  N.T., July 3, 2014 at 12:37-38; July 11, 2014 at 9:55-56.  Those costs were estimated at the hearing to be $30,000.  N.T., July 3, 2014 at 12:38; July 11, 2014 at 9:56.

Given the existing lien upon any recovery, as well as the contingency fee agreement and anticipated expenses, were the debtors to receive a collectable judgment in this litigation of $412,000 or less, debtors' counsel explained that the debtors themselves would receive little or no net payment.  N.T., July 3, 2014 at 12:40-42; July 11, 2014 at 10:09-11.  Absent a settlement with both the defendant and the lienholder, wherein the latter would agree to compromise its lien claim, given Mr. Soppick's prior compromise and release agreement he gave in receiving workers compensation benefits, the EMC lien claim against any judgment in the litigation is viewed as unchallengeable by debtors' counsel.  N.T. July 3, 2014 at 12:41-43.

To date, the defendant has refused to discuss any settlement with the debtors, as it feels strongly that its fire engine vehicle is safely designed.  N.T., July 11, 2014  at 9:46.  Debtors' state court counsel also acknowledged that the state court product liability/personal injury litigation had been pending for more than seven years, and that he had not pressed the defendant nor the state court for a trial date.  N.T., July 3, 2014 at

---

[8](...continued)
contested matter, as the identity is not germane, I may refer to the lienholder as EMC.

12:03-04.  He attributed such delay in part to his inaction and in part to the lack of

availability of the parties' experts, as well as to his erroneous belief that the debtors'

bankruptcy filing stayed this litigation, see ex. M-34, and that he needed to be retained by

the chapter 13 trustee to prosecute this state court civil action.  See ex. M-36; N.T., July 3,

2014 at 12:03; July 11, 2014 at 9:28-29.  Although counsel was uncertain whether the

defendant had concluded all discovery, N.T., July 11, 2014 at 9:37-38,[9] at a hearing in

this contested matter counsel stated that he now realizes that the bankruptcy stay does not

apply and that he need not be engaged by the bankruptcy trustee.  See N.T., July 11, 2014

at 9:30.  Therefore he intends to try to obtain a state court trial date, which he believes

might occur by January, 2015.  N.T., July 11, 2014 at 9:42 (mentioning a final pretrial

conference, typically, in about 90 days and trial thereafter, depending upon court and

counsel schedules, in roughly another 90 days).

Unless the tort litigation settled before trial, debtors' counsel estimated that

the trial before a jury could last 3 to 6 days.  N.T., July 11, 2014 at 9:58.  Post-verdict

motions and appeals could add at least two years to final resolution of that litigation.

N.T. July 11, 2014 at 10:16.  Without appeals, and depending upon the amount of the

judgment entered, the debtors might receive some payment within 2015.  N.T., July 11,

2014 at 10:15.  He acknowledged that it was possible that the debtors would receive no

recovery from this lawsuit, especially given the size of the subrogation lien.  See N.T.,

July 3, 2014 at 12:41-43.

---

[9]The state court had scheduled a discovery management conference for September
27, 2013, ex. M-35, which conference was never held because of the belief that the litigation had
been stayed by the debtors' bankruptcy filing.  N.T., July 11, 2014 at 9:31.

The debtors have represented in this court, and as their proposed amended plans implied, that in order to reorganize and provide for the Borough's allowed secured claim, they need to prevail in their product liability/personal injury action and receive a substantial judgment. See ex. M-22, at 2, ¶ 3(B)(2) (litigation is related to the viability of their chapter 13 plan), at 4, ¶ 3 ("The Debtors' Plan is dependent on Mr. Soppick's personal injury suit . . . .")  Indeed, debtors' state court counsel expressed his own belief at the hearing that the debtors needed to be successful in their product liability/personal injury litigation, and in an amount above the workers' compensation lien, in order to successfully reorganize under chapter 13.  N.T., July 11, 2014 at 9:16-17.  Nevertheless, despite the importance of this litigation to the debtors' reorganization efforts, they made no effort to insure that their state court claim, which was not stayed by their bankruptcy filing, see Maritime Elec. Co., Inc. v. United Jersey Bank, 959 F.2d 1194, 1204 (3d Cir. 1991) ("the clear language of section 362(a) indicates that it stays only proceedings against a 'debtor'"), was prosecuted in the more than one year that this bankruptcy case has been pending.

By orders entered on July 31, 2014, the debtors' motion to avoid the Borough's judgment lien against the Moir Avenue realty under 11 U.S.C. § 522(f) as well as their objection to the Borough's proof of claim were resolved.  I held that the Borough held a prepetition secured claim in the amount of $132,924.08, and that the Borough's judicial lien claim was partially avoided, as impairing the debtors' exemptions, to the extent that the secured claim exceeds $100,878.65.  See docket entries ##149, 151.

After the hearings on the instant dismissal motion concluded, the debtors filed a second amended chapter 13 plan, dated August 18, 2014, in conjunction with their

15

amended memorandum in opposition to dismissal.  See docket entry #164; see generally 11 U.S.C. § 1323(a) ("The [chapter 13] debtor may modify the plan at any time before confirmation.").  They argue in their amended posthearing memorandum that this latest proposed plan should be considered in determining the Borough's motion for relief under section 1307(c).

This second amended August 2014 plan does not change the prior May 2014 plan proposal, in that Wells Fargo would still receive $9,251.19 to cure the debtors' post-bankruptcy mortgage arrearage; the chapter 13 trustee would still receive a commission set at 8% but not to exceed 10%; there would be a distribution for attorney's fees to debtors' counsel of $4,376.00; the IRS would receive full payment of its priority claim of $4,538.43; and there would be no distributions to general unsecured creditors. See Second Amended Plan, ¶¶ 3(A), 4-5.

The August 2014 second amended proposed plan, however, contains the following modified funding provision:

> During the ten (10) month period from August 2013, through May, 2014, $200.00 per month;
>
> During the three (3) month period from June, 2014, through August, 2014, $600.00 per month; and
>
> During the forty-seven (47) month period from September, 2014 through July, 2018, $1,847.00 per month;

Second Amended Plan, ¶ 2(A)-(C).  These payments, if made, would total $90,609.

The latest proposed plan, moreover, provides that these monthly payments can be changed along with the total amount to be paid under the plan.  The payments and amount due under this plan can be reduced:

16

If any of the following events occur, the Debtors may modify
their Plan to reduce the monthly payments due under this Plan
by either reducing the base amount due under the Plan or by
making a lump sum payment toward the current base amount
due under the Plan:

(i) the Debtors appeal with the Commonwealth Court results
in a judgment in favor of West Conshohocken Borough less
than $60,000.00, in which case the base amount will be
reduced dollar for dollar (plus a similar reduction in present
value interest included in this Plan under the Till case);

(ii) the Debtors receive an award from the case of Soppick v.
Emergency One, Inc., Montgomery County Court of Common
Pleas No. 2007-00128 and make a lump sum payment toward
the base amount; or

(iii) Debtor, Janet Soppick, receives a favorable decision in
her Social Security Disability case and makes a lump sum
payment toward the base amount;

<u>Id.</u>, ¶ 2(D).

In addition, the second amended plan provides that the total amount to be

paid would be increased from $90,609 by $41,500, to a new total of $132,109, if the

debtors' "Commonwealth Court appeal is unsuccessful." <u>Id.</u>, ¶ 2(E).  The August 2014

proposed plan does not explain how this additional sum is to be paid.  Instead, the

proposed plan merely states that this increased amount "shall be included in a modified

plan to be proposed to the Court within thirty (30) days of any adverse decision of the

Commonwealth Court. . . ." <u>Id.</u>, ¶ 3(E).

Finally, this latest proposed plan alters somewhat the treatment of the

Borough's allowed secured claim that had been set forth in the May 2014 proposed plan:

In the course of this case, the Debtors will pay the entire
allowed secured portion of the claim of West Conshohocken
Borough, as ultimately determined by the Court through claim
litigation (which in turn may be further modified based upon a
ruling of the Pennsylvania Commonwealth Court in the case

17

Soppick v. Borough of West Conshohocken, 571 C.D. 2013,
possibly followed by a remand to the Montgomery County
Court of Common Pleas and revised decision in the lower
court), motion to avoid judgment lien, and/or an adversary
proceeding pursuant to 11 U.S.C. §506, through payments to
the Trustee under the Chapter 13 Plan.  Initially, upon
confirmation, Debtors shall make monthly payments to the
Trustee sufficient to pay a total of at least $60,000.00 plus
present value interest under the *Till* case (at 4.25%).  If the
Commonwealth Court appeal is unsuccessful or if no decision
is issued by the Commonwealth Court within nine (9) months
of confirmation, an increase of $41,500.00 in the base amount
in the Plan shall be included in a modified plan to be proposed
to the Court within thirty (30) days of any adverse decision of
the Commonwealth Court or ten (10) months of confirmation
(without regard to whether the Debtors appeal any such
decision further). If the Debtors fail to file a motion to Modify
Plan After Confirmation that is granted by the Court, any
interested party or the Trustee may move for dismissal. At the
end of the Plan, if the Debtors have completed all their Plan
payments, the claim of West Conshohocken Borough will be
completely satisfied, and West Conshohocken Borough will
be responsible for promptly causing the judgment to be
marked "satisfied" in the case, West Conshohocken Borough
v. Soppick, Montgomery County Court of Common Pleas No.
2007-27397, and the case to be marked "discontinued and
ended", without additional cost to the Debtors.

Id., ¶ 3(B).

II.

As noted at the outset, the Borough has filed a motion to dismiss this case

under 11 U.S.C. § 1307(c).  In addition to maintaining that this case should be dismissed

because of unreasonable delay that is prejudicial to creditors, see section 1307(c)(1), the

Borough contends that dismissal is warranted because the debtors filed their bankruptcy

case in bad faith, and the debtors' plan proposal cannot be confirmed because the it does

18

not meet the requirements of sections 1325(a)(4), (a)(5) and (a)(6).  See Borough's

Posthearing Memorandum, at 18-30.  In sum, the Borough contends:

> The Debtors' bankruptcy was not filed in good faith.  The
> Debtors' Chapter 13 Plan was denied on April 1, 2014 and the
> evidence demonstrates that the Debtors are unlikely to be able
> to propose in the near future a feasible, viable chapter 13 plan
> in the near future. Since there is no legitimate purpose in
> continuing the chapter 13 case as reorganization is futile,
> dismissal is warranted under section 1307(c).  In re Foley,
> 2008 Bankr. LEXIS 3518, 27-30, 2008 WL 5411070 (Bankr.
> E.D. Pa. Oct. 2, 2008).

Id., at 31.

As an order of dismissal of the case terminates the bankruptcy stay under 11

U.S.C. § 362(c)(2)(B), I shall consider the issue of dismissal first, as it may render moot

the parties' separate lift-stay motions.  See generally In re Sykes, 554 Fed. Appx. 527,

528 (7th Cir. 2014); Montelione v. Federal Nat. Mortg. Ass'n, 183 Fed. Appx. 200, 201

(3d Cir. 2006); In re Sparrgrove, 313 B.R. 283, 289 (W.D. Wis. 2004).


A.


Section 1307(c) provides that a chapter 13 case may be dismissed or

converted to chapter 7 for "cause" shown, and provides 11 examples of when cause has

occurred.  As the statute uses the term "including," and as section 102(3) of the

Bankruptcy Code states that this term is not limiting, the statutory examples are not

exclusive:

> More pertinently, the latter provision, § 1307(c), provides that
> a Chapter 13 proceeding may be either dismissed or converted
> to a Chapter 7 proceeding "for cause" and includes a
> nonexclusive list of 10 causes justifying that relief.

19

Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 372-73 (2007).[10]

Whether cause exists and, if so, whether the chapter 13 case should be dismissed or converted to chapter 7, are issues within the discretion of the bankruptcy court:

> Section 1307(c) provides a Bankruptcy Court with the power to dismiss a bankruptcy case for "cause."  11 U.S.C. § 1307(c).  A Bankruptcy Court has considerable discretion in determining whether "cause" exists and whether dismissal is the appropriate remedy.  E.g., In re Orawsky, 387 B.R. 128, 137 and n. 15 (Bankr. E.D. Pa. 2008) (citing cases); 8 Collier on Bankruptcy, ¶ 1307.04[4] (15th ed., rev.) ("As under the other subsections of section 1307(c) [i.e., sections other than § 1307(c)(4) ], the court's power to dismiss or convert is discretionary.").  See also In re Dixon, Slip Op., 2009 WL 151688, *2 (Bankr. E.D. Pa., 2009); In re Henry, 368 B.R. 696, 699 (N.D. Ill. 2007) (same).

In re Pierson, 2009 WL 1424472, *2 (E.D. Pa. May 19, 2009); see, e.g., In re Mallory, 476 Fed. Appx. 766, 767 (5th Cir. 2012); In re Dempsey, 247 Fed. Appx. 21, 25 (7th Cir. 2007);  see also In re Myers, 491 F.3d 120, 125 (3d Cir. 2007) ("We review the Bankruptcy Court's decision to dismiss the bankruptcy case as a bad faith filing for abuse of discretion.").

Although not expressly mentioned in section 1307(c), courts have long concluded that "cause" under section 1307(c) implies the requirement that the chapter 13 case be filed in good faith.  See, e.g., Matter of Smith, 848 F.2d 813, 816 n.3 (7th Cir. 1988); In re March, 83 B.R. 270, 275 (Bankr. E.D. Pa. 1988).  As the Third Circuit explained:

---

[10]Although Marrama was decided in 2007, the Court referred to the version of section 1307(c) that listed only ten examples of cause for relief.  In 2005, the statute was amended to add an eleventh example.

It is clear that Chapter 13 contains no explicit good faith requirement.  Section 1307(c) provides, however, that Chapter 13 petitions may be dismissed "for cause."  11 U.S.C. § 1307(c).  The Seventh, Ninth and Tenth Circuits have held that lack of good faith in filing [a chapter 13 bankruptcy petition] is sufficient cause for dismissal under section 1307(c). . . .  We agree.

As the Seventh Circuit has noted, however, "good faith is a term incapable of precise definition."  In re Love, 957 F.2d [1350] at 1355 [(7th Cir. 1992)].  As a result, we believe that "the good faith inquiry is a fact intensive determination better left to the discretion of the bankruptcy court."  Id.  We therefore join the Seventh, Ninth and Tenth Circuits in holding that the good faith of Chapter 13 filings must be assessed on a case-by-case basis in light of the totality of the circumstances. . . .  Factors relevant to the totality of the circumstances inquiry may include, among others, the following:

> the nature of the debt . . .; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996) (citations and footnote omitted); see In re Myers, 491 F.3d at 125.[11]

---

[11]Since Lilley was decided, section 1325(a)(7), enacted by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, added the plan confirmation requirement that "the action of the debtor in filing the petition was in good faith[.]"  This provision is applicable in this 2013 bankruptcy filing.

At least one court has suggested that the obligation of a chapter 13 debtor to commence a chapter 13 case in good faith now resides in section 1325(a)(7) rather than section 1307(c).  In re Torres Martinez, 397 B.R. 158, 165 (B.A.P. 1st Cir. 2008).  If so, then the obligation of bankruptcy courts to determine whether a proposed plan meets all the requirements of section 1325(a), see United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 277 (2010), may place at issue in all chapter 13 cases the debtor's good faith filing, whether raised by a party

(continued...)

Ultimately, whether a chapter 13 case has been filed in good faith requires an examination of all circumstances surrounding the filing and is subject to bankruptcy court discretion.  As noted by one court in this district:

> Section 1307(c) provides a non-exclusive list of grounds constituting cause, including "unreasonable delay that is prejudicial to creditors." 11 U.S.C. § 1307(c).  Although the statute makes no express mention of "bad faith," it is well established that lack of good faith may also be cause for dismissal under § 1307(c).  In re Lilley, 91 F.3d 491 (3rd Cir.1996).  Good faith must be assessed based on the totality of the circumstances, including but not limited to factors such as the timing of the petition, the nature of the debt, whether the debtor has been forthcoming with the Bankruptcy Court and the creditors, and the debtor's motivation in filing the petition.  Id.  Accordingly, the decision to dismiss Mr. Pierson's case pursuant to § 1307 can be, as here, based on findings of fact concerning lack of good faith.

In re Pierson, 2009 WL 1424472, at *2; see also Haines v. Miller, 2004 WL 1987218, at *3 (E.D. Pa. Aug. 16, 2004):

---

[11](...continued)

in interest.  See In re Torres Martinez, 397 B.R. at 165-66 & n.9.  As the Borough expressly challenged the propriety of the debtors' chapter 13 petition, I need not decide whether to raise that issue sua sponte.

Moreover, shortly after its enactment in 2005, some courts concluded that section 1325(a)(7) "appears to be nothing more than a codification of the long-standing judge-made rule and a corollary of § 1307(c). . . ." In re Shafer, 393 B.R. 655, 659 (Bankr. W.D. Wis. 2008); see also In re Aprea, 368 B.R. 558, 566 (Bankr. E.D. Tex. 2007). That position seems to be accepted by bankruptcy courts within this circuit post-2005, as they still apply the Lilley factors under section 1307(c) when considering the issue of bad faith.  See, e.g., In re Young, 2013 WL 6223831, *7 (Bankr. M.D. Pa. Dec. 2, 2013); In re Scotto-DiClemente, 459 B.R. 558, 562 (Bankr. D.N.J. 2011); In re Dahlgren, 418 B.R. 852, 857-58 (Bankr. D.N.J. 2009); see also In re Mondelli, 558 Fed. Appx. 260, 262-63 (3d Cir. 2014) (affirming the bankruptcy court order dismissing the case under section 1307(c), and applying the factors set out in In re Lilley).

As the Borough seeks dismissal under section 1307(c), and as the debtor does not argue that section 1325(a)(7) requires the application of a different approach to the issue of bad faith, I shall assume that the Lilley standard is appropriate, without now deciding whether section 1325(a)(7) imposes a different good faith standard, or replaces section 1307(c) as a basis for dismissal.

The standard of review is clear: "Courts can determine good faith only on an ad hoc basis and must decide whether the petitioner has abused the provisions, purpose, or spirit of bankruptcy law" and "the decision to dismiss a petition for lack of good faith rests within the sound discretion of the bankruptcy court."  In re Tamecki, 229 F.3d 205, 207 (3d Cir. 2000).  See also In re Lilley, 91 F.3d 491, 496 (3d Cir. 1996) (quoting In re Love, 957 F.2d at 1355) ("good faith is a term incapable of precise definition" which requires a "fact intensive determination better left to the discretion of the bankruptcy court" on a "case-by-case basis in light of the totality of the circumstances.").

Among the circumstances that demonstrate a bad faith chapter 13 bankruptcy filing is when the intent of the debtor and purpose of the chapter 13 petition is simply to stay a prepetition judgment, or ongoing non-bankruptcy litigation, without the ability to reorganize and provide for the creditor holding that judgment or involved in that litigation:

We have no doubt that Bankruptcy Courts may reasonably find that bad faith exists "where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose." In re Dami, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994).

In re Myers, 491 F.3d at 125.

In particular, although a bankruptcy filing intended to serve in lieu of a supersedeas bond may not be filed in bad faith per se, see generally In re Pomodoro Restaurant, 251 B.R. 441 (Table), 1999 WL 282735, at *3 (B.A.P. 10th Cir. 1999), a chapter 13 case may be filed in bad faith in such circumstances.  See Harker v. United States, 112 F.3d 513 (Table), 1997 WL 199507 (8th Cir. 1997); see also In re Mense, 509 B.R. 269, 279 (Bankr. C.D. Cal. 2014) (dismissing chapter 11 case as filed in bad faith, where the bankruptcy petition filed to avoid posting supersedeas bond); In re Davis, 93

B.R. 501 (Bankr. S.D. Tex. 1987) (same); In re Karum Group, Inc., 66 B.R. 436 (Bankr.

W.D. Wash. 1986) (same).

Among the factors considered in deciding whether a debtor has filed a bad

faith bankruptcy case because he is attempting to use a bankruptcy filing to prosecute a

state court appeal while the bankruptcy stay prevents the creditor/appellee from

exercising its state court rights are:

> Whether the debtor intends to pursue an effective
> reorganization within a reasonable period of time, or whether
> the debtor is unwilling or unable to propose a meaningful plan
> until the conclusion of the litigation.

In re Mense, 509 B.R. at 280 (footnote with citations omitted).


## B.


Related to its contention that this case should be dismissed owing to the

debtors' prejudicial delay and bad faith filing, the Borough also argues that dismissal

relief is warranted under section 1307(c) because the debtors are unable to meet the

statutory requirements for confirming a chapter 13 plan that can provide for its allowed

secured claim.  As the debtors filed this chapter 13 case in order to prevent the Borough's

execution upon its state court judgment, if they are unable to reorganize while providing

for the Borough's allowed secured claim, dismissal may be warranted.

In the context of a chapter 11 reorganization, my colleague, Chief Judge

Frank, has noted that the inability to propose a viable reorganization plan warrants

dismissal or conversion under section 1112(b) of the Bankruptcy Code:

> Fundamental bankruptcy policy continues to support the
> proposition that the inability to propose a feasible
> reorganization or liquidation plan provides "cause" for
> dismissal or conversion of a chapter 11 case on request of an
> interested party.

In re DCNC North Carolina I, LLC, 407 B.R. 651, 665 (Bankr. E.D. Pa. 2009); see also

In re SHAP, LLC, 457 B.R. 625, 629 (Bankr. E.D. Mich. 2011).

A similar conclusion is warranted in determining cause for relief in chapter

13 under section 1307(c), which is the chapter 13 equivalent to section 1112(b).  That is,

there is no legitimate purpose for a debtor to remain in chapter 13 if the debtor, after

given fair opportunity to do so, has been unable to propose a chapter 13 plan that can

meet the confirmation requirements of sections 1322 and 1325.  See, e.g., In re Dempsey,

247 Fed. Appx. at 25 ("Section 1307(c)(1) provides that a bankruptcy court may dismiss a

Chapter 13 petition for 'unreasonable delay by the debtor that is prejudicial to creditors.'

11 U.S.C. § 1307(c)(1). . . .  One such well-recognized instance of prejudice is the

debtor's protracted inability to demonstrate the feasibility of a plan."); In re Yarborough,

2012 WL 4434053, *2 (Bankr. E.D. Tenn. Sept. 24, 2012) ("The right to convert [from

chapter 7] to Chapter 13, however, is not absolute, and conversion may be denied where

'cause' would exist to convert or dismiss the debtor's Chapter 13 case under 11 U.S.C. §

1307(c), including inability to propose a confirmable plan and bad faith.") (footnote and

citations omitted); In re Darlington, 2009 WL 6498171, at *5 (Bankr. N.D. Ga. Sept. 11,

2009) ("Pursuant to section 1307(c)(1), (c)(4), and (c)(5), the Debtor's case is subject to

being dismissed due to unreasonable delay by the Debtor that is prejudicial to creditors,

the Debtor's failure to commence making timely payments, and her inability to propose a

confirmable plan."); In re Johnson, 2008 WL 821848, at *5 (Bankr. D. Md. Mar. 25,

2008) ("Furthermore, because the court now finds that Debtor will be unable to confirm a plan in chapter 13, 'cause' exists pursuant to Section 1307(c) to support the reconversion of this case to chapter 7."); In re Soost, 290 B.R. 116, 133 (Bankr. D. Minn. 2003) ("[D]enial of confirmation of a plan on objection by a party in interest, coupled with the patent inability to propose a confirmable plan, constitutes cause for dismissal of a Chapter 13 case."); see generally In re Vincente, 260 B.R. 354, 361 (Bankr. E.D. Pa. 2001) ("In the absence of any bankruptcy purpose to continue this Chapter 13 case, and finding the proffered reasons for its retention being without merit, cause exists to dismiss the case. 11 U.S.C. § 1307(c).").

C.

In arguing that these debtors are unable to reorganize, the Borough specifically focuses upon the confirmation requirement found in 11 U.S.C. § 1325(a)(6), which limits approval only to those plans when "the debtor will be able to make all payments under the plan and to comply with the plan." Thus, section 1325(a)(6) requires that visionary or speculative chapter 13 plans not be approved. The feasibility requirement has been analyzed in the following terms:

> To satisfy feasibility, a debtor's plan must have a reasonable likelihood of success, i.e., that it is likely that the debtor will have the necessary resources to make all payments as directed by the plan. 11 U.S.C. § 1325(a)(6). . . . The debtor carries the initial burden of showing that the plan is feasible. . . . Before confirmation, the bankruptcy court should be satisfied that the debtor has the present as well as the future financial capacity to comply with the terms of the plan.

In re Fantasia, 211 B.R. 420, 423 (B.A.P. 1st Cir. 1997) (citations omitted); see In re Scott, 188 F.3d 509 (table), 1999 WL 644380, at *1 (6th Cir. 1999); In re Harris, 199 B.R. 434, 436 (Bankr. D.N.H. 1996) (feasibility requires that the proposed chapter 13 plan have a likelihood of success).[12]

The Borough argues that the debtors' last two proposed plans called for increased monthly payments, followed by a lump sum payment at the end of their plan. The monthly payments rely upon income the debtors do not presently have, and the lump sum payment relies upon the debtors' success in their product liability/personal injury state court lawsuit. The Borough considers both funding sources highly speculative and thus violative of section 1325(a)(6).

In general, "[chapter 13] [p]lans that propose payments using funds from unidentified and uncertain sources are scrutinized very carefully, and plans that are vague about the timing and means of payment are not confirmable." In re Paulson, 477 B.R. 740, 746 (B.A.P. 8th Cir. 2012) (citation omitted). When a plan is to be funded from future income, a chapter 13 debtor meets his/her burden of demonstrating the viability of a chapter 13 plan by showing a stable employment history, present employment, and a current income level sufficient to make proposed plan payments. See, e.g., In re Nottingham, 228 B.R. 316, 321 (Bankr. M.D. Fla. 1998). A few courts, however, have found a chapter 13 plan feasible when the debtor is presently unemployed but has

---

[12]A similar feasibility provision is found in chapter 11 cases at 11 U.S.C. § 1129(a)(11). Courts have noted that the purpose of the chapter 11 feasibility requirement is to prevent confirmation of "visionary schemes." See Matter of Pizza of Hawaii, Inc., 761 F.2d 1374, 1382 (9th Cir. 1985). "Although § 1129(a)(11) does not require a plan's success to be guaranteed, . . . the plan must nevertheless propose 'a realistic and workable framework[.]'" In re American Capital Equipment, LLC, 688 F.3d 145, 156 (3d Cir. 2012) (citations omitted).

demonstrated a sufficient likelihood of re-employment.  See, e.g., In re Compton, 88 B.R. 166, 167 (Bankr. S.D. Ohio 1988); In re Van Gordon, 69 B.R. 545, 547 (Bankr. D. Mont. 1987) (the plan was found feasible because "the evidence of the Debtor is that his employment prospects after termination of his present job are good, and will provide him with the same level of income he has received in the past").  Compare In re Anderson, 21 B.R. 443, 446 (Bankr. N.D. Ga. 1981) (unemployed debtor was unable to show he could supply regular and stable income).

Similarly, if a chapter 13 debtor is self-employed, the feasibility of his/her proposed plan will be based upon his/her earnings history (preferably demonstrated by federal tax returns), his/her current income and the likely stability of that income in the future.  If he/she has no such income at the time of the confirmation hearing, the debtor has the burden to demonstrate a sufficient likelihood that adequate self-employment income is imminent, or that some other income source, such as governmental benefits, can fund his/her plan.  See generally, e.g., In re Hammonds, 729 F.2d 1391, 1394-95 (11th Cir. 1984); In re Upton, 363 B.R. 528, 535 n.6 (Bankr. S.D. Ohio 2007); In re Ford, 345 B.R. 713, 722 (Bankr. D. Colo. 2006).  Absent a showing that the chapter 13 debtor will likely have sufficient income to fund her proposed plan, confirmation will be denied. See, e.g., In re Scott, 1999 WL 644380, at *1 ("Without a credible basis to find that he could pay the $100 per month that his plan required, the plan could not be confirmed.").

Similarly, a chapter 13 debtor has the evidentiary burden to demonstrate that a proposed plan lump sum or balloon payment is likely to be made.  See, e.g., In re Wagner, 259 B.R. 694, 700 (B.A.P. 8th Cir. 2001); In re Fantasia, 211 B.R. at 423 ("The inclusion of a balloon payment is not dispositive of a plan's feasibility. Confirmation of

28

such a plan is suspect, however, unless some proof is offered to show that the funds will

be available at the time the balloon payment is due.").  If that evidentiary burden is not

met, then confirmation will be denied.

Courts have generally applied a "totality of the circumstances" approach to

considering the feasibility of such balloon proposals.  See, e.g., In re Gregory, 143 B.R.

424, 426 (Bankr. E.D.Tex.1992) (propriety of balloon payment should be considered

under the totality of the circumstances).  When the source of the proposed balloon

payment is dependent upon the future outcome of litigation, courts have refused to

confirm a chapter 13 plan without persuasive evidence that the litigation outcome is likely

to be favorable to the debtor.  See, e.g., In re Jensen, 425 B.R. 105, 110 (Bankr. S.D.N.Y.

2010); In re Rey, 2006 WL 2457435, at *7 (Bankr. N.D. Ill. Aug. 21, 2006) ("A lawsuit's

outcome, though, is always speculative. Without a solid basis for believing litigation is

highly likely to generate large sums of money quickly, it cannot provide a sufficiently

reliable source of income to support confirmation."); In re Ewald, 298 B.R. 76, 82

(Bankr.E.D.Va.2002) (§ 1325(a)(6) not satisfied where the proposed plan is to be funded

by the outcome of a three-year-old lawsuit, and debtor failed to demonstrate a reasonable

likelihood of success in that litigation); In re Cherry, 84 B.R. 134, 139 (Bankr. N.D.Ill.

1988):

> Projections of the income necessary to finance a plan of
> reorganization must be based on concrete evidence of
> financial progress and must not be speculative, conjectural or
> unrealistic. . . .  The record provides no basis for determining
> that there is anything other than a speculative chance of a
> $170,000 recovery in Mr. Cherry's lawsuit.  There is certainly
> no concrete evidence of the lawsuit's favorable progress
> through the Illinois court system.

See also In re American Capital Equipment, LLC, 688 F.3d at 156 ("A plan will not be feasible [as required by section 1129(a)(11)] if its success hinges on future litigation that is uncertain and speculative, because success in such cases is only possible, not reasonably likely."); In re Reines, 30 B.R. 555, 562 (Bankr.D.N.J.1983) (plan predicated in part upon "highly speculative return from a lawsuit" was not feasible); see generally Rocco v. J.P. Morgan Chase Bank, 255 Fed. Appx. 638, 641 (3d Cir. 2007) (non-precedential) ("[B]ankruptcy courts in this Circuit have held that a lawsuit is too speculative in nature to offer adequate protection. . . .  In general, and in this specific instance, we agree with that conclusion.").

In this chapter 13 case, in resolving the debtors' objection to the Borough's proof of claim, as well as the debtors' motion to avoid the Borough's judicial lien, I previously fixed the allowed secured claim of the Borough at $100,878.65.  Here, the debtors have proposed amended chapter 13 plans that attempt to provide for the Borough's allowed secured claim, with plan payments to the trustee totaling $69,700, later amended to $90,609.  After payment of the chapter 13 trustee's commission at 8%, the arrearage claim of Wells Fargo ($9,251.19), the IRS priority claim (4,538.43), and counsel fees ($4,376.00), the Borough would have received only $45,958.38 under the May, 2014 plan, and only $65,194.66 from the more recent August, 2014 proposal.

In the context of the feasibility of the debtors' most recent plan proposal, I note that, in their posthearing memoranda, the debtors contend that if the Pennsylvania Commonwealth Court were permitted to decide their appeal it would be successful, and so the Borough's claim for purposes of this motion should be treated as though it were

30

only $60,000.  Debtors' Posthearing Memorandum, at 6; Debtors' Amended

Memorandum at 14-15 (unpaginated).

D.

The section 1325(a)(3) requirement that confirmation of a chapter 13 plan is

limited to those plans proposed in good faith.  Although not expressly relied upon by the

Borough in the present motion, it has been often defined with reference to three general

criteria: "a) whether the debtor has stated his debts and expenses accurately; b) whether

he has made any fraudulent misrepresentations to mislead the bankruptcy court; c) or

whether he has unfairly manipulated the Bankruptcy Code." In re Norwood, 178 B.R.

683, 688 (Bankr. E.D.Pa. 1995) (Raslavich, B.J.).

A more elaborate restatement of these three factors was made in the

following manner:

> One of the requirements for confirmation of a Chapter 13 plan
> under § 1325 is that the court find that the plan is proposed in
> "good faith."  11 U.S.C. S 1325(a)(3). The Bankruptcy Code
> does not define that term. . . .  There is no set formula to
> determine whether a plan is proposed in good-faith; it is to be
> judged by the totality of the circumstances on a case by case
> basis. . . .  However, a good-faith determination does require
> "honesty of intention" on the part of the debtor and requires a
> bankruptcy court to inquire whether the debtor has
> misrepresented facts in his plan, unfairly manipulated the
> Bankruptcy Code, or otherwise proposed his plan in an
> inequitable manner.

Connelly v. Bath National Bank, 1995 WL 822677, *3 (W.D.N.Y. Apr. 13, 1995)

(citations omitted).

Subsumed within this third criterion of good faith — that there be no

"unfair manipulation of the Code"— is the notion of fairness and equity to creditors.  See

In re Cordes, 147 B.R. 498, 504 (Bankr. D.Minn. 1992):

> The third . . . factor—whether the debtor "has unfairly
> manipulated the Bankruptcy Code" — is the most open-ended
> of all the . . . factors.  It is, however, the one most centrally
> implicated in this case.  Its application to the facts at bar
> requires one to recognize the "big picture" in bankruptcy.  An
> equitable balance between the rights of debtors and the rights
> of creditors underlies the structure of the Bankruptcy Code.

The Seventh Circuit Court of Appeals reached a similar conclusion

regarding the breath of the good faith requirement:

> [O]ne of the primary purposes of the good faith evaluation in
> both contexts[13] is to "force[ ] the bankruptcy court to examine
> 'whether or not under the circumstances of the case there has
> been an abuse of the provisions, purpose, or spirit of [the
> Chapter]. . . .'"  See id.  [Matter of Smith, 848 F.2d] at 818
> (quoting Rimgale, 669 F.2d at 431).  At base, this inquiry
> often comes down to a question of whether the filing is
> fundamentally fair.  See Schaitz, 913 F.2d at 453 ("the most
> fundamental and encompassing [factor when evaluating good
> faith] is whether the debtor has dealt fairly with his
> creditors.")  In other words, the focus of the good faith
> inquiry under both Section 1307 and Section 1325 is often
> whether the filing is fundamentally fair to creditors and, more
> generally, is the filing fundamentally fair in a manner that
> complies with the spirit of the Bankruptcy Code's provisions.

Matter of Love, 957 F.2d 1350, 1357 (7th Cir. 1992).

---

[13]There are two good faith requirements in chapter 13.  One requires that the plan
be proposed in good faith, as expressly noted in section 1325(a)(3).  The other now found in
section 1325(a)(7), is that the bankruptcy petition be filed in good faith.  As mentioned earlier,
the latter requirement was long-held to be implied by section 1307(c).  In re Lilley, 91 F.3d at
496.  While there is a relationship between the two good faith requirements, they are nonetheless
distinct.  See Matter of Smith, 848 F.2d 813 (7th Cir. 1988).  The quotation in the text addresses
both requirements.

Where a chapter 13 debtor has proposed a plan which is fundamentally unfair or inequitable to creditors, such a proposal has been denied confirmation on the basis of a lack of good faith in the proposal.  See, e.g., In re Porter, 102 B.R. 773, 775 (B.A.P. 9th Cir. 1989) (section 1325(a)(3) concerns whether the debtor acted "equitably" in proposing their plan); In re Lindsey, 183 B.R. 624, 629 (Bankr. D.Id. 1995) ("Meanwhile, the debtor is holding, and the amended plan would allow her to continue to hold, her commercial property rent free while interest and property taxes continue to accrue.  This, in and of itself is an unfair manipulation of the Bankruptcy Code").  Compare In re Groff, 131 B.R. 703, 708 (Bankr. E.D. Wisc. 1991) (chapter 13 proposal which called for the debtor to surrender "landlocked" realty to the secured creditor was made in good faith because the debtors also proposed to provide an easement to the creditor which would afford reasonable access to the surrendered property).

In determining the fairness and equity of any plan proposal — i.e., its "good faith" — one must consider the risks to be borne by creditors if the proposed plan payments were not made.  See In re Delaney, 108 B.R. 631, 633 (Bankr. S.D. Ohio 1989) (confirmation of debtor's proposed chapter 13 plan is denied where the plan inequitably places the risk of non-performance by a non-debtor upon a secured creditor).

The Borough complains in its post-hearing memorandum that the debtors' financial disclosures in this case have been slow and inaccurate, requiring various amendments to filings, as well as the Borough's efforts to discover the relevant information.  It also complains about the delay and risks to it if the debtors' proposed plan were not completed owing to the debtors' reliance upon speculative future income, and reliance upon a lump sum payment that may never be made.

33

E.


Whether or not a specific confirmation objection has been made, this court

has the right to independently determine that a debtor's proposed chapter 13 plan meets

all statutory requirements based upon the evidence presented at confirmation.  See, e.g.,

United Student Aid Funds, Inc. v. Espinosa, 559 U.S. at 277 n.14 (2010) ("Section

1325(a) . . . requires bankruptcy courts to address and correct a defect in a debtor's

proposed plan even if no creditor raises the issue."); In re Szostek, 886 F.2d 1405, 1414

(3d Cir. 1989) (same).

Consistent with this instruction, and directly related to the Borough's

contention that this case should be dismissed owing to the debtors' inability to propose a

viable chapter 13 plan of reorganization that provides for its allowed secured claim, and

that the debtors's May 2014 plan proposal had not complied with section

1325(a)(5)(B)(ii), I requested at the conclusion of the final hearing that the parties also

consider whether the debtors' reorganization efforts could meet the confirmation

requirement found in 11 U.S.C. § 1325(a)(5)(B)(iii)(I). Section 1325(a)(5)(B) states in

relevant part:

> (5) with respect to each allowed secured claim provided for
> by the plan--
> 
>                          ***
> (B)(i) the plan provides that--
> 
> (I) the holder of such claim retain the lien securing such claim
> until the earlier of--
> 
> > (aa) the payment of the underlying debt
> > determined under nonbankruptcy law; or
> > 
> > (bb) discharge under section 1328; and

34

***

     (ii) <u>the value, as of the effective date of the plan, of property
to be distributed under the plan on account of such claim is
not less than the allowed amount of such claim;</u> and

     (iii) if--

     (I) <u>property to be distributed pursuant to this subsection is in
the form of periodic payments, such payments shall be in
equal monthly amounts;</u>

(emphasis added).

     Insofar as an effective date under a chapter 13 plan is concerned:

     [a]lthough the Bankruptcy Code does not define the phrase
"effective date of the plan," the "most logical interpretation,"
and that endorsed by the courts and commentators that have
addressed the issue, is that the effective date is the date the
plan becomes binding on the parties.

<u>In re Hoopai</u>, 581 F.3d 1090, 1101 (9th Cir. 2009) (quoting <u>In re Pak</u>, 378 B.R. 257, 265

(B.A.P. 9th Cir. 2007)).  As a result,  "[t]he effective date of a chapter 13 plan means the

date of the order confirming the plan unless the plan itself defines another date."  <u>In re</u>

<u>Cupolo</u>, 2013 WL 486338, at *3 (Bankr. E.D. Ky. Feb. 5, 2013); <u>see</u>, <u>e.g.</u>, <u>In re</u>

<u>Lukaszewski</u>, 414 B.R. 15, 20 n.2 (Bankr. D. Conn. 2009) ("The term 'effective date' is

not defined in the Bankruptcy Code, but for purposes of § 1325(b)(1), "the most logical

interpretation . . . is the date of plan confirmation, as a chapter 13 plan is not binding on

the debtor and other interested parties until it is confirmed.") (citing <u>In re Lanning</u>, 545

F.3d 1269, 1279 (10th Cir. 2008)); <u>In re Gibson</u>, 415 B.R. 735, 738 (Bankr. D. Ariz.

2009).

     Section 1325(a)(5)(B)(ii), providing that the secured creditor shall receive

the value of its allowed secured claim on the plan's effective date (unless the creditor

affirmatively accepts a proposed chapter 13 plan providing for a lesser treatment), requires payment of post-confirmation interest.  See, e.g., Till v. SCS Credit Corp., 541 U.S. 465, 469 (2004); In re Milham, 141 F.3d 420, 424 (2d Cir. 1998) ("Postconfirmation interest, or plan interest, is a function of the present value requirement of the cram-down provision."); General Motors Acceptance Corporation v. Jones, 999 F.2d 63, 66 (3d Cir. 1993).

Apparently,  the debtors now recognize that their May 2014 proposed plan did not meet the requirement of providing post-confirmation interest to the Borough and have filed in August 2014 a second amended plan in an attempt to rectify that omission. For purposes of this contested matter, I shall assume that the post-confirmation interest provision in the August 2014 proposed plan would meet the requirement of section 1325(a)(5)(B)(ii).[14]

The May 2014 proposed plan also provided for trustee distributions to the Borough on its allowed secured claim via monthly payments, followed by a lump sum or balloon payment; the more recent August 2014 plan proposal does the same, albeit upon somewhat different terms.  Section 1325(a)(5)(B)(iii)(I), which was added to the Bankruptcy Code in 2005, see also H.R. Report No. 109-31(I). at 73 (2005), would seemly preclude confirmation of a plan that contained such a payment scheme to an objecting secured creditor.

Although "[t]here is scant, if any, formal legislative history revealing Congress' purposes [in enacting this provision]," In re Bollinger, 2011 WL 3882275, at

---

[14]Not discussed by either party is the Borough's entitlement to pre-confirmation interest under section 506(b), to be mentioned below.

*3 (Bankr. D. Or. 2011), nonetheless, courts have applied the express language of this

2005 statutory provision when considering approval of a chapter 13 plan, noting that:

> The most likely conclusion is that the language requiring
> equal periodic payments is a straightforward prohibition of
> repayment schemes that allocate the bulk of the payments to
> some point in the future.  Balloon payments are a common
> feature in consumer and commercial finance: if Congress had
> intended to permit the use of the technique in chapter 13 plans
> it could have easily done so by adding such authority to the
> plain language of the statute.

Id., 2011 WL 3882275, at *3.  Indeed, not only can a plan provision calling for funding

via a lump sum or balloon payment run afoul of section 1325(a)(5)(B)(iii)(I), so can a

plan provision calling for increased monthly plan payments over time:

> Prior to BAPCPA [the 2005 amendments to the Bankruptcy
> Code], it was not uncommon for some Chapter 13 plans to
> provide for backloaded payments, such as balloon payments.
> Another form of backloading involved graduated or step-up
> payment plans, where the payments started out smaller and
> increased over time.  Secured creditors, particularly those
> secured by a vehicle, viewed this as unfair, exposing them to
> undue risk in light of the constant depreciation of their
> collateral.
>
> Other plans, filed by debtors whose employment is seasonal,
> provided for reduced payments or no payments at all during
> certain months of the year, or called for payments to be made
> quarterly or semi-annually, rather than monthly, based upon
> the peculiarities of the debtor's income stream. Secured
> creditors had similar complaints with those plans.
>
> In response to those creditor concerns, Congress enacted the
> equal payment provision and a companion provision
> extending the concept of adequate protection, formerly a
> preconfirmation requirement, to postconfirmation plan
> payments. 11 U.S.C. § 1325(a)(5)(B)(iii)(II). The equal
> payment provision prevents debtors from backloading
> payments to secured creditors or paying them other than on a
> monthly basis.

37

In re Erwin, 376 B.R. 897, 901 (Bankr. C.D. Ill. 2007); see also In re Acosta, 2009 WL 2849096, at *3 (Bankr. N.D.Cal. May 7, 2009); In re Luckett, 2007 WL 3125278, at *1 (Bankr. E.D. Wisc. Oct. 24, 2007).

Accordingly, a proposed chapter 13 plan that calls for a secured creditor to receive payment on its allowed secured claim via distributions from monthly payments made by the debtor to a chapter 13 trustee, followed by a lump sum or balloon payment during or at the end of the plan, have been held to violate the confirmation requirement found in section 1325(a)(5)(B)(iii)(I).  See, e.g., In re Hamilton, 401 B.R. 539, 543-44 (B.A.P. 1st Cir. 2009); In re Spark, 509 B.R. 728, 729-30 (Bankr. M.D. Fla. 2014); In re Holifield, 2014 WL 948828, at *1 n.3 (Bankr. D. Or. Mar. 12, 2014); In re Kirk, 465 B.R. 300, 303 (Bankr. N.D. Ala. 2012).

F.

The Borough also maintains that the debtors have had more than sufficient opportunity to propose a viable plan.  Thus, it argues that their failure to do so by this date, after now three attempts, warrants dismissal.  See generally, e.g., In re Dempsey, 247 Fed. Appx. at 25 (a debtor's "protracted inability to demonstrate the feasibility of a plan" warrants dismissal); In re Watkins, 2008 WL 708413, at *4 (E.D.N.Y. Mar. 14, 2008) ("Given the debtor's inability to propose a satisfactory plan after three opportunities for amendments, it cannot be said that the bankruptcy court abused its discretion in dismissing the Chapter 13 case."); In re Wile, 310 B.R. 514, 518–19 (Bankr. E.D. Pa.2004) (undue delay warranted relief under section 1307(c)(5)).

Indeed, the continued inability of a chapter 13 debtor to propose a viable

plan of reorganization can constitute cause for relief under section 1307(c)(1) for

unreasonable delay that is prejudicial to creditors:

> The general principles that guide whether this case should be dismissed for "unreasonable delay" were articulated by Chief Judge Sigmund in In re Wile, 310 B.R. 514, 517 (Bankr. E.D. Pa. 2004):
>
>> In enacting the Bankruptcy Code, Congress carefully balanced the rights of debtors and creditors. For example, while the automatic stay enjoins creditor action against the debtor and her property, it provides the creditor with adequate protection of its interest in the debtor's property so that its position does not deteriorate while it is statutorily enjoined.  Moreover, it is generally accepted that the debtor's burden to demonstrate that a reorganization is in process increases with the passage of time.  Finally, because creditors' rights are constrained during the pendency of Chapter 13 proceedings, the Bankruptcy Code contemplates that a plan will be promptly confirmed so that payments to creditors may commence.
>
> Id. at 517 (citation and footnoted omitted).

In re Jackson, 2007 WL 1188202, *5 (Bankr. E.D. Pa. Apr. 18, 2007); see also In re

Paulson, 477 B.R. at 746 ("The debtor's continued failure to propose a plan that property

treated these two secured creditors resulted in unreasonable delay to the prejudice of all

creditors."); In re De la Salle, 461 B.R. 593, 605 (B.A.P. 9th Cir. 2011) ("More than a

year after debtors filed their petition, they still had not confirmed a chapter 13 plan. Given

the passage of time and debtors' repeated failure to provide for the claim secured by their

residence in their plan, the bankruptcy court correctly concluded that conversion of

debtors' case was warranted on account of the resultant delay and prejudice."); In re

Jensen, 425 B.R. at 109 (cause for relief under section 1307(c)(1) was shown because, in part, "[t]he Debtor has done nothing to address the infeasibility of the plan or move ahead with the potential lawsuit regarding the foreclosure or the sale of his interest in the limited partnership.").

III.

A.

At the time the debtors commenced their chapter 13 bankruptcy case in July 2013, they disclosed negative net monthly income after monthly expenses, that included modest self-employment income from Mr. Soppick and workers' compensation payments to Mrs. Soppick.  Their purpose in filing their bankruptcy petition was to prevent the Borough's imminent execution sale of their Moir Avenue realty; indeed, they were current on their monthly mortgage payments to Wells Fargo and their initial proposed plan would have provided for distributions only to two creditors: the Borough and the IRS.

Although Mr. Soppick later became employed in 2014, there was no evidence presented that he had employment prospects in July 2013.  Moreover, his current income from employment (Mrs. Soppick has no current income) is insufficient to fund a reorganization plan that would pay the Borough its allowed secured claim in full, with interest under section 1325(a)(5)(B)(ii), even in the proposed reduced amount of $60,000.  Therefore, any reorganization prospect at the time of filing was dependent upon

the debtors' product liability/personal injury action pending since 2007 in state court and, to a lesser extent, their state Commonwealth Court appeal from the Borough's March 2013 judgment against them.

That reliance has not changed since this case commenced. Any reorganization plan approved by this court must provide for the Borough's substantial allowed secured claim in full, with interest, under section 1325(a)(5)(B)(ii), as the Borough will not agree to any lesser treatment.

In the debtors' amended posthearing memorandum they state:

> The Debtors filed an initial Chapter 13 Plan near the beginning of the case under which they proposed to pay relatively modest monthly payments and relied heavily upon the proceeds they expected from the product liability case to fund the Plan. At the time, the Debtors' income and resources were such that they had no real alternative for funding the Plan, and they reasonably believed that either their Commonwealth Court appeal would be successful or their product liability case would result in a settlement or verdict by the time confirmation was scheduled, or both. However, the Debtors also had other prospects for resources to fund their Plan in case neither of the foregoing came to fruition. Janet Soppick was receiving regular workers compensation checks at the time of filing the case, but was pursuing a case that eventually led to her receiving a lump sum settlement in approximately January, 2014 (the settlement was reached in December, 2013). Ms. Soppick had also filed for Social Security Disability in February, 2013, but was and is still awaiting a hearing with an administrative law judge on her claim. Joseph Soppick was working to improve revenues from his business, Emergency Vehicle Repairs and Restorations.

Id., at 4 (unpaginated).[15]

---

[15]The dates specific mentioned in the debtors' memorandum, quoted above, were not made part of the record in this contested matter.

Whether the existence of this personal injury claim at the time of the debtors' bankruptcy filing rendered the chapter 13 petition in good faith in July 2013, or rendered their three proposed chapter 13 plans in good faith, for various reasons argued by the debtors and opposed by the Borough, are issues I need not now determine. Nor need I decide, as the Borough complains, whether the debtor's disclosure of their prepetition product liability/personal injury claim as having an unknown value was intentionally misleading or violates the best interest of creditors' test found in section 1325(a)(4).[16]

Instead, I find that the Borough is entitled to relief under section 1307(c) because, for the following reasons, the debtors have been unable to meet the statutory confirmation requirements of section 1325(a) despite three attempts over more than one year. I conclude that they have had ample time to propose a viable plan and that their inability to do so, given the circumstances of this case, warrants relief.

---

[16]In recently filing an objection to the debtors' most recently amended Schedule C exemptions, the Borough may not appreciate that the debtors, by listing a "$0" as the value of their exempt interest in their product liability/personal injury lawsuit on their original as well as amended Bankruptcy Schedules C, resulted in their right to exempt none of the proceeds of the litigation, and all would be payable to the bankruptcy estate for distribution to creditors. See In re Orton, 687 F.3d 612 (3d Cir. 2012); In re Messina, 687 F.3d 74 (3d Cir. 2012). Similarly, in arguing that this litigation will fund their proposed plan through a significant judgment but offering unsecured creditors no distribution, the debtors also appear to have missed the consequence of their exemption claim. See generally In re Solomon, 67 F.3d 1128, 1132 (4th Cir. 1995) (11 U.S.C. § 1325(a)(4) requires that a chapter 13 plan provide unsecured creditors with a dividend at least equal to the amount those creditors would receive in a chapter 7 liquidation.)

B.

In their amended posthearing memorandum, the debtors acknowledged that there was no evidence presented that would suggest that I treat the Borough's allowed secured claim at less than the amount raised by their present appeal: $60,000. Therefore,

> in order to successfully advocate confirmation of their Chapter 13 Plan and thereby avoid dismissal, Debtors will need to demonstrate that they can make plan payments in sufficient amount for the Trustee to disburse a minimum of $60,000.00 plus present value interest pursuant to the *Till* case to the Borough. If the Debtors are ultimately unsuccessful with their Commonwealth Court appeal, or if the Bankruptcy Court declines to grant their Motion for Limited Relief to pursue the Commonwealth Court appeal, the Debtors will need to demonstrate that they can make plan payments in sufficient amount for the Trustee to disburse a minimum of $100,878.65 plus present value interest pursuant to the *Till* case to the Borough.

Debtors' Amended Posthearing Memorandum, at 5-6 (unpaginated).

The debtors' also acknowledge that if they were not permitted to prosecute their Commonwealth Court appeal while the Borough's collection efforts were stayed, or were that appeal to prove unsuccessful, a viable plan would require plan payments of more than the $90,000 presently proposed in their August 2014 plan. In those circumstances, in order to reorganize and pay the present value of the allowed secured claim of the Borough, plus their priority and mortgage arrearage payments, the debtors concede that a confirmable chapter 13 plan would need payments totaling more than $138,000. See id., at 6.

In addition, in further recognition that the viability of their August 2014 proposed chapter 13 plan is highly relevant to the instant motion to dismiss, the debtors contend:

43

> [T]here are really only three serious issues the Court needs to
> resolve in order to decide whether to dismiss the Debtors'
> case, or rather to allow them to proceed with their recently
> filed Second Amended Plan and their case in light of the
> recent Court rulings.  The three issues are: (1) whether the
> Debtors can rely in part upon monies from a prospective
> settlement or verdict in Soppick v. Emergency One, Inc.,
> Docket No. 2007-00128 in order to fund their Chapter 13
> Plan; (2) whether a Plan that has periodic payments may also
> include a lump sum payment without violating the provision
> in 11 U.S.C. §1325(a)(5)(iii)(I) that requires equal monthly
> installments; and (3) whether it is feasible for Debtors to be
> able to fund a Plan that includes the foregoing amounts.

Id., at 7-8 (unpaginated).  I shall consider the three issues framed by the debtors.  Based

upon the evidence presented, I answer all three queries posed in the negative.

## C.

I quickly conclude that there is no basis in the evidence to consider Mrs.

Soppick's pending social security disability claim as a viable plan funding source.

Despite the debtors' contention to the contrary, see Debtors' Amended Posthearing

Memorandum, at 14 (unpaginated), other than the fact that she applied for disability

benefits and was denied, which denial is on appeal, the record is silent as to the nature of

her disability, the nature of the medical evidence, if any, in support of such a claim, as

well as the amount and timing of any award.  This potential funding source is much too

speculative to meet the feasibility requirement of section 1325(a)(6).  See generally, e.g.,

U.S. v. Rader, 2002 WL 1354714, at *2 (S.D. Ind Apr. 17, 2002); In re Rey, 2006 WL

2457435, at *7.

As mentioned earlier, the debtors' May and August 2014 plans are premised upon the automatic stay being lifted so that they can prosecute their state court appeal, and upon their success on appeal in reducing the Borough's judgment against them to no more than $60,000.  I will assume <u>arguendo</u> that, although I have no power to alter the May 2013 judgment entered by the state court, <u>see</u>, <u>e.g.</u>, <u>Lance v. Dennis</u>, 546 U.S. 459, 463 (2006); <u>Atlantic Coast Line Railroad Co. v. Brotherhood of Locomotive Engineers</u>, 398 U.S. 281, 296 (1970) ("[L]ower federal courts possess no power whatever to sit in direct review of state court decisions."), a chapter 13 plan that relies upon the future success of a state court appellate challenge to that judgment can be confirmed if the debtor demonstrates that the appeal is reasonably likely to succeed.  <u>See generally</u> <u>In re American Capital Equipment, LLC</u>, 688 F.3d at 156.  Here, that appeal is based solely upon a legal argument that I conclude is unlikely to prevail.

The statute referred to by their state court counsel, 53 P.S. § 10617.2(b) (also quoted earlier) could provide relief from the continued accrual of daily fines for zoning violations, as it states that: "The court of common pleas, upon petition, may grant an order of stay, upon cause shown, tolling the per diem fine pending a final adjudication of the violation and judgment."  According to the express language of the statute, the grant of the stay is permissive, not mandatory, and requires the filing of a petition seeking such relief.  There is no dispute that the debtors never petitioned the state trial court for relief under section 10617.2(b).

I shall further assume that the debtors could have requested a stay of the accrual of daily fines from the Commonwealth Court in connection with their appeal.  <u>See generally</u> Pa. R. App. P. 1732.  In general, the granting of a petition for a stay pending

45

appeal in a zoning dispute is not automatic, as it involves consideration of four factors, and should first be addressed to the discretion of the trial court.  See East Penn Township v. Troxell, 2011 WL 10877015 (Pa. Cmwlth. Jan. 5, 2011); see generally Maritrans G.P., Inc. v. Pepper, Hamilton & Scheetz, 524 Pa. 415, 420 (1990).  Similarly, a request for a stay under 53 P.S. § 10617.2(b) also requires a demonstration of cause to obtain such relief, for which the party seeking the stay would have the burden to demonstrate.

Moreover, in determining the merits of the debtors' legal contention—that their appeal from the imposition of daily fines automatically stayed the accrual of such fines while the appeal was before the Commonwealth Court—the Commonwealth Court is likely to consider relevant its two decisions in Babin v. City of Lancaster, 89 Pa. Cmwlth. 527 (1985) and 125 Pa.Cmwlth. 470 (1989).

In Babin, Mr. and Mrs. Babin receiving approval from the City of Lancaster Zoning Board to operate a health club.  The local zoning officer later concluded that the Babins instead were operating a message parlor in violation of the City zoning ordinance. When the Babins did not alter their business operations, the City brought suit to enjoin the Babins from further operations.  "The City was granted the requested injunction and the Babins were fined $1,000 each for past violations and the chancellor imposed additional fines of $200 per day if Appellants continued in violation of the Board's December 1, 1980 decision after October 15, 1983."  Id., 89 Pa. Cmwlth. at 530.  The Commonwealth Court affirmed the trial court's order for relief, including the daily fines, citing 53 P.S. 10617.  Id., 89 Pa. Cmwlth. at 533.

The City then returned to the Court of Common Pleas and obtained a judgment against the Babins in the amount of $172,200, based upon the operation of their

business in violation of the earlier injunction for 851 days.  Id., 125 Pa.Cmwlth. at 472-

73.  The Babins challenged that judgment on appeal, arguing that they had posted a

supersedeas bond during their first appeal, and, as a result

> that they cannot be assessed daily fines during the time period
> they were operating under a supersedeas.  They argue that the
> trial court cannot simultaneously permit Appellants to operate
> a business and then fine them for such operation. Appellants
> contend that the trial court's grant of supersedeas operated as
> a stay and halted the running of the $200.00 per diem fine
> during the pendency of their appeal. Thus, we are asked to
> decide whether a grant of supersedeas pending appeal inhibits
> the trial court's power to render judgment against Appellants
> by decree nisi and impose daily fines for violation of such
> judgment.

Id., 125 Pa.Cmwlth. at 473.

The Commonwealth Court held that the supersedeas bond only stayed the

execution of a judgment pending appeal, but did not render a lower court's order of the

daily fines invalid.  Id., 125 Pa.Cmwlth. at 473.  Furthermore, the appellate court

explained:

> We believe the key language in the trial court's order is
> supersedeas pending appeal.  The trial court found that
> Appellants were engaging in illegal conduct and prohibited
> them from continuing in business on pain of daily fines.
> Appellants chose to continue in business thereby knowingly
> violating the trial court's order while they prosecuted an
> appeal.  The entry of a supersedeas does not make Appellants'
> conduct any less illegal or in any way vacate or remove the
> trial court's sanctions for continuing to engage in illegal
> conduct.  The trial court's order and sanctions remain on the
> books pending the resolution of the appeal.  Supersedeas
> merely delays the execution of the order and accompanying
> sanctions.

Id., 125 Pa.Cmwlth. at 474.  The appellate court then added:

> In sum, Appellants made a knowing decision to continue in
> business for 851 days under an order that imposed a $200.00

47

per day sanction for this conduct while prosecuting an appeal. This order was never striken or overturned during the pendency of this appeal.  Since this order remained in effect for every one of the 851 days that Appellants operated, and Appellants' appeal and supersedeas have ended, Appellants must now pay the piper.

Id., 125 Pa.Cmwlth. at 474-75.

Where, as occurred here, the debtors never requested a stay from either the trial court or appellate court to prevent the assessment of daily fines against them pending their appeal, and thus never demonstrated any entitlement to such a stay, in light of the language of the state statute upon which the fines were based and a stay permitted, and given the aforementioned Babin decisions, I view it unlikely that the state Commonwealth Court would sustain their latest appeal.  If an appeal from the order imposing daily fines for a zoning ordinance violation automatically stayed such fines while the appeal was pending, the Commonwealth Court would not have addressed the limited significance of the supersedeas bond in its second Babin decision.

Thus, for purposes of confirmation, I consider the debtor's potential success in their state court appeal too speculative when applying section 1325(a)(6) to their latest proposed plan.  See, e.g., In re Cherry, 84 B.R. at 139.  Thus, to confirm a chapter 13 plan, the debtors would not be able to treat the Borough's secured claim as if it were only $60,000.

D.

As the debtors and their counsel have long recognized, a viable chapter 13 plan must rely heavily upon the future outcome of their pending state court product

48

liability/personal injury case.   After carefully considering the evidence presented, I find the debtors' likelihood of being able to repay the Borough's allowed secured claim from the proceeds of the debtors' product liability/personal injury lawsuit too speculative, both in timing and amount, to meet the feasibility test for confirmation.   It may be possible that they will obtain in the future a substantial monetary reward, but such a result is not reasonably likely to occur.

First, there was no evidence presented that a settlement of this litigation has been or ever was under discussion.  Second, in Pennsylvania (as in other jurisdictions) a plaintiff's success in prosecuting a products liability case is often heavily dependent upon persuasive expert testimony.  See, e.g., French v. Commonwealth Associates, Inc., 980 A.2d 623, 633-34 (Pa. Super. 2009); Dansak v. Cameron Coca-Cola Bottling Co., Inc., 703 A.2d 489, 495-96 (Pa. Super. 1997).  While the debtors have engaged an individual that they believe will allow them to meet their evidentiary burden, the defendant in the state court litigation has engaged three such individuals who opined that the fire truck was safe as manufactured.  As debtors' counsel acknowledged, whether a jury would find the defendant liable after hearing all of the evidence is uncertain.

Third, even if the debtors' prove liability they must also be awarded substantial damages.  I have found that the Borough holds an allowed secured claim of almost $101,000.  This claim is oversecured, in that the sum of the Wells Fargo mortgage lien and the Borough's unavoided judgment lien is less than the value of the debtors' Moir Avenue realty, thereby entitling the Borough to interest under section 506(b) from July 2013, the commencement of the case, until the effective date of the plan, see, e.g., Rake v. Wade, 508 U.S. 464, 468 (1993), probably at the state court legal rate of 6% per

annum.  See In re Crane Automotive, Inc., 98 B.R. 233, 236-37 (Bankr. W.D. Pa. 1989).

Thereafter, the Borough would be entitled to post-effective date interest under section

1325(a)(5)(B)(ii).

      Unless the debtors were able to increase substantially their monthly income

and tender increased monthly payments to the trustee for an extended period, which itself

is problematic based upon their income at present, in order to repay the Borough's

allowed secured claim in full, with interest, would require that the debtors be awarded

perhaps as much as $600,000 in damages, given the $412,000 state law subrogation lien,

and the debtors' contingency agreement with counsel.[17]  Even if I accept that the debtors

can prove economic damages of $350,000 to a jury, their ability to obtain a judgment high

enough to repay the Borough's allowed secured claim in full is also problematic, as their

attorney further acknowledged.  See Debtors' Amended Posthearing Memorandum, at 12

(unpaginated) ("[debtors' counsel] was very candid that if the case goes to trial it is

possible that the Soppicks may not receive any recovery").

      Fourth, if the debtors' state court lawsuit went to trial and they were

received a satisfactory jury verdict, it is unclear when the Borough would receive

---

[17]A hypothetical $600,000 damage judgment would yield $370,000 after payment of counsel's one-third contingency fee plus $30,000 in court costs.  Fees and expenses, which total approximately 38% of this hypothetical award, would be divided between the debtors and the subrogated lienholder, pro rata.  I estimate that division to apportion the $230,000 in fees and costs at roughly $157,000 lienholder and $73,000 debtors.  Therefore, the lienholder would have its $412,000 lien payment reduced by $157,000, while the debtors would have their $188,000 distribution reduced by $73,000, leaving $115,000 as payable to them.

      Without adding any pre-confirmation postpetition interest under section 506(b)—which at the 6% legal rate would be about $6,550 for 13 months—the debtor assumed that postconfirmation interest at 4.5% would increase $8,617.82 to the Borough's distribution under section 1325(a)(5)(B)(ii).  See Debtors' Amended Posthearing Memorandum, at 6.  Thus, a total of more than $15,000 in interest could be added to the Borough's allowed secured prepetition claim of $100,878.65.

payment.  The case has been pending since 2007 and has not yet been scheduled for trial.

Discovery may not yet have concluded.   Any jury verdict is subject to post-trial motions

and appeals that may take years to resolve.

Therefore, based upon the evidence presented, the debtors' proposed plans,

including their latest, are reliant upon speculative funding from long-pending state court

litigation and would not meet the feasibility standard of section 1325(a)(6).  See, e.g., In

re Ewald, 298 B.R. at 82.

The debtors, unsuccessfully, may have attempted to finesse this concern, by

including a provision in their proposed plan, ¶ 3(B), that, they suggest, gives them only a

nine-month window "from the date of confirmation in which to make the payment or

otherwise convince the Court that they can modify their Plan to meet the higher base

amount. . . ."  Debtor's Amended Posthearing Memorandum, at 12 (unpaginated).  Not

only is this nine-month deadline tied to permitting the debtors to proceed with their

problematic Commonwealth Court appeal while continuing to restrain the Borough's

execution efforts, for the reasons stated above there is no evidence to suggest that a viable

chapter 13 plan could be proposed at the end of nine months, or that they should be given

nine additional months to propose a viable plan.[18]

---

[18]In their amended posthearing memorandum, at 15 (unpaginated), the debtors
argue that they "are beginning to explore refinancing to fund the $41,500" additional plan
funding they may need.  There was no evidence in the record concerning possible refinancing.
See In re Gundrum, 509 B.R. 155, 164 (Bankr. S.D. Ohio 2014) ("[S]peculative plans that hinge
on a contingent event, such as refinancing or sales of real estate, which are scheduled to occur
months or perhaps even years away, simply cannot meet the feasibility standard under §
1325(a)(6).").
        They also contend, at 15 (unpaginated) that Mrs. Soppick, despite her testimony to
the contrary, is willing to contribute to plan funding from her lump sum workers compensation
award.  As mentioned earlier, there was no evidence offered as to the amount of that award that

(continued...)

E.


The debtors also argue that their latest proposed plan does not run afoul of

11 U.S.C. § 1325(a)(5)(B)(iii)(I), quoted above, which requires that if an allowed secured

claim is to be repaid in full, over time, through periodic plan payments, that such

payments be in equal amounts.  The debtors interpret this provision as follows:

> Bankruptcy Code §1325(a)(5)(iii)(I) [sic] that requires equal
> monthly installments should not be held to preclude lump sum
> payments from other sources, such as retroactive social
> security benefits anticipated, proceeds of sale of a home or
> other property, or a recovery from a product liability case.
> Only the periodic portion of the payment should be deemed
> by the Court to be required to be made in equal monthly
> installments.

Debtors' Amended Posthearing Memorandum, at 14 (unpaginated).  They further contend

that "[n]one of the cases decided on the basis of §1325(a)(5)(iii)(I) discuss whether or not

a plan can included both periodic payments and lump sum payments."  Id., at 14-15

(unpaginated).[19]  This statutory interpretation is unpersuasive and overlooks numerous

court decisions applying this confirmation requirement.  See also 8 Collier on

Bankruptcy, ¶ 1325.06[3][b][ii][A] (16th ed. 2013) ("[T]he provision [section

---

[18](...continued)
has not already been spent by the debtor, or the amount she needs to retain for her future monthly
expenses.  Thus, the significance, if any, of such a contribution is unknown.

[19]The debtor refers to In re Desardi, 340 B.R. 790 (Bankr. S.D. Tex. 2006), one of
the earliest decisions addressing the 2005 statutory provision, for support.  This decision is
inapposite, as it held that section 1325(a)(5)(B)(iii)(I) only requires that the periodic distribution
payments to the secured creditor under a plan be level once they begin.  (Numerous courts have
disagreed with that statutory interpretation.)  Here, the issue is whether the debtor can tender
monthly plan payments, which may not be in an equal amount, followed by a lump sum payment
derived from the proceeds of litigation.

1325(a)(5)(B)(iii)(I)] does preclude, absent a creditor's acceptance, a plan that provides

for a series of payments followed by a balloon payment in a larger amount.").[20]

      For example, in In re Hamilton, 401 B.R. 539 (B.A.P. 1st Cir. 2009), the

chapter 13 debtor proposed a plan that called for payment in full of the allowed secured

claim of a mortgagee, through distributions from equal monthly plan payments over 60

months, plus a lump sum payment derived from refinancing the mortgage debt on or

before the 60th month of the plan. The bankruptcy appellate panel held that this proposal

clearly violated the confirmation provision of section 1325(a)(5)(B)(iii)(I). Id., at 543-44;

see also In re Schultz, 363 B.R. 902, 903 (Bankr. E.D. Wisc. 2007) (chapter 13 plan that

called "for monthly payments of $533.24 of principal and interest on the mortgage loan,

with the unpaid balance due at the end of 60 months to be paid by refinancing" could not

be confirmed); In re Wagner, 342 B.R. 766 (Bankr. E.D. Tenn. 2006) (same).

      Similarly, a proposed chapter 13 plan that provided for payments to the

trustee of $1,874.41 per month, followed by a lump sum payment upon refinance of the

mortgage or sale of the realty within 48 and 60 months of confirmation did not meet the

periodic payment requirement.  In re Acosta, 2009 WL 2849096, at *1-*3; In re Luckett,

2007 WL 3125278, at *1-*2.

      Not only is the debtors' proposed lump sum payment from litigation

proceeds, coupled with monthly plan payments, in conflict with the statute, the debtors'

latest proposed plan contains conditions that are likely to arise—given the plan's

unpersuasive assumption that the Borough's allowed secured claim would be reduced to

---

[20]In their amended posthearing memorandum, at 12 (unpaginated), the debtor recognize that the proposed lump sum payment in their August 2014 plan is "akin to a balloon payment."

$60,000—that would require the debtor to increase the amount of the monthly payments to be made under the plan.  Therefore, even the proposed plan monthly payments would be unequal, and so would also violate section 1325(a)(5)(B)(iii)(I).  See In re Rivera, 2008 WL 1957896, at *5 (N.D. Ind. May 2, 2008).

Accordingly, I agree with the Borough's assertion that all three plans proposed by the debtors in this case, including the latest plan, would not be confirmed in light of section 1325(a)(5)(B)(iii)(I), even if they were feasible.

F.

For the reasons just stated, I answer all three issues proposed by the debtors as germane to the Borough's motion under section 1307(c) in a manner justifying the requested relief.   After more than 13 months in this bankruptcy case, the debtors have not proposed a viable chapter 13 plan that could be approved over the certain opposition of their largest secured creditor, the Borough.

In addition, they commenced this bankruptcy case with net negative income in order to prevent the Borough from executing on its judgment, rather than seek a state court stay of execution.  They then proposed an initial chapter 13 plan, primarily to address the Borough's claim, which plan proposals was clearly not confirmable.  Even the second plan they filed contained at least one obvious defect, in that it failed to provide the Borough with the present value of its allowed secured claim.  I also note that the debtors fell behind in their mortgage payments postpetition.

54

Moreover, although they knew from the outset that an important funding source for any reorganization would be their pending state court product liability/personal injury action, they have done nothing during their more than one year in bankruptcy to prosecute that claim.  See In re Jensen, 425 B.R. at 109.

Given the totality of the circumstance of this case, I conclude that the debtors should not be afforded additional time to attempt to reorganize while the Borough, Wells Fargo, the IRS and other creditors remain stayed from recovery on their claims.  Thus, the Borough has demonstrated that relief under section 1307(c) is warranted.  See, e.g., In re Dempsey, 247 Fed. Appx. at 25; In re Watkins, 2008 WL 708413, at *4; In re Wile, 310 B.R. at 518–19.

IV.

Once grounds for relief  under section 1307(c) have been demonstrated, whether to dismiss the case or convert it to chapter 7 is within the discretion of the bankruptcy court, see, e.g., In re Jacobsen, 609 F.3d 647, 652 (5th Cir. 2010); In re Myers, 491 F.3d at 127; In re Wile, 304 B.R. at 206, with the exercise of that discretion focused, as the statute mandates, upon "whichever is in the best interests of creditors and the estate."  See, e.g., In re Jacobsen, 609 F.3d at 662; In re Owens, 552 F.3d 958, 961 (9th Cir. 2009).

Some courts have compiled a non-exclusive list of factors to consider in determining whether to direct that a chapter 13 case be converted to chapter 7 or be dismissed, once cause for relief under section 1307(c) has been demonstrated:

The Bankruptcy Code does not provide criteria for
determining whether to dismiss or convert a Chapter 13 case
upon a finding of cause, other than consideration of what is in
the "best interest" of creditors and the bankruptcy estate.  The
decision to convert or dismiss falls within the sound
discretion of the court.  Because the language of 11 U.S.C. §
1307(c) mirrors the language contained in 11 U.S.C. §
1112(b), factors relevant to the question of whether dismissal
or conversion is in the best interests of creditors and the estate
in a chapter 11 case are also helpful to the Court's
consideration of conversion versus dismissal within the
context of a chapter 13 case.  Factors considered by courts
when considering whether dismissal or conversion under 11
U.S.C. § 1112(b) is in the best interest of creditors and the
estate include:

(1) whether some creditors received preferential payments,
whether equality of distribution would be better served by
conversion rather than dismissal; (2) whether there would be a
loss of rights granted in the case if it were dismissed rather
than converted; (3) whether the debtor would simply file a
further case upon dismissal; (4) the ability of the trustee in a
chapter 7 case to reach assets for the benefit of creditors; (5)
in assessing the interest of the estate, whether conversion or
dismissal of the estate would maximize the estate's value as
an economic enterprise; (6) whether any remaining issues
would be better resolved outside the bankruptcy forum; (7)
whether the estate consists of a "single asset,"; (8) whether
the debtor had engaged in misconduct and whether creditors
are in need of a chapter 7 case to protect their interests; (9)
whether a plan has been confirmed and whether any property
remains in the estate to be administered; and (10) whether the
appointment of a trustee is desirable to supervise the estate
and address possible environmental and safety concerns.

In re Ferri, 2010 WL 1418147, at *3 (Bankr. D.N.M. 2010) (footnotes omitted); see

generally In re Gollaher, 2011 WL 6176074, at *3 (B.A.P. 10th Cir., Dec. 13, 2011)

(discussing the application of section 1112(b)).

"Courts also consider the preferences expressed by creditors for either

dismissal or conversion as they are the best judge of their own best interests."  In re

Gollaher, 2011 WL 6176074, at *4.  Here, neither the chapter 13 trustee, the IRS, Wells

Fargo, the Borough, nor any other creditor has suggested that conversion to chapter 7, rather than dismissal, is appropriate.

Among the factors that courts consider in deciding whether conversion or dismissal of a reorganization case is warranted is whether creditors would benefit were the case converted, or be prejudiced were the case dismissed.  Thus, it may be appropriate to convert a chapter 13 case when a chapter 7 trustee would be able to liquidate the realty (or other property of the estate) for the benefit of all creditors.  See generally, e.g., In re Keeley and Grabanski Land Partnership, 460 B.R. 520, 545 (Bankr. D.N.D. 2011); In re Schmidt Bros. Produce Co., 1996 WL 33401182, at *2 (Bankr. C.D. Ill. Jan. 10, 1996).

Conversely, to the extent that a chapter 7 trustee would not, upon conversion, administer any non-exempt assets of the debtor for the benefit of unsecured creditors, e.g., because the assets are fully encumbered, see, e.g., In re Traverse, 753 F.3d 19, 25 (1st Cir. 2014) (chapter 7 trustee should not sell fully encumbered assets), conversion to chapter 7 is generally unwarranted.  In such an instance, dismissal is typically more appropriate than conversion to chapter 7.  See generally, e.g., In re Fall, 405 B.R. 863, 871 (Bankr. N.D. Ohio 2009) (absent a showing of substantial equity, case would be dismissed under section 1112(b) rather than converted to chapter 7), aff'd sub nom., Fall v. Farmers & Merchants State Bank, 2009 WL 974538 (N.D. Ohio Apr. 9, 2009); In re Northeast Family Eyecare, P.C., 2002 WL 1836307, at *6 (Bankr. E.D. Pa. July 22, 2002) (dismissal was more appropriate than conversion because "[a] Chapter 7 trustee could not operate this business nor are there any unencumbered assets to liquidate for creditors"); In re Tornheim, 181 B.R. 161, 168 (Bankr. S.D.N.Y. 1995) ("The debtors do not have any property that a chapter 7 trustee could administer for the benefit of

57

creditors. Conversion, therefore, does not serve the interest of the creditors and the estate.").

In the instant bankruptcy case, were this case converted the chapter 7 trustee would not attempt to sell the debtors' Moir Avenue realty because there is no non-exempt equity in that property in light of the liens held by Wells Fargo, the Borough, and the debtors' exemption claim.  Nor would a chapter 7 trustee attempt to operate Mr. Soppick's modest vehicle repair business under section 721.  The trustee is also likely to reject his business lease under section 365(d)(4).  Moreover, there is no evidence that a chapter 7 trustee would have potential preference or avoidance actions to pursue.

Less clear is whether a chapter 7 trustee, after abandoning the debtors' Moir Avenue realty, which would terminate the bankruptcy stay as to that property, see 11 U.S.C. § 362(c)(1), would attempt to keep the bankruptcy case open simply to prosecute the pending product liability/personal injury action.  As previously discussed, that asset is also encumbered by a substantial subrogation lien.

Given the limited amount of unsecured claims in this case, the age of the state court case as well as the length of time it may take to prosecute the state court litigation, plus the large judgment that would be needed to make any worthwhile distribution to unsecured creditors,[21] it is likely that a chapter 7 trustee would elect to abandon that prepetition claim as well, and so administer the case as one having no non-exempt assets to liquidate.

---

[21]The amount needed above $412,000 to make a meaningful distribution to unsecured creditors would depend upon the sheriff sale distribution to the Borough if it proceeded with an execution sale of the debtors' realty after the termination of the bankruptcy stay upon abandonment of that property by a chapter 7 trustee.

As just mentioned, there is generally little if any benefit to creditors in converting a chapter 13 case to chapter 7 when the trustee will not administer any assets for the benefit of unsecured creditors.  See In re Tornheim, 181 B.R. at 168.  The debtors, however, might receive the benefit of a chapter 7 discharge, but they do not request conversion for that purpose.

Upon dismissal, the bankruptcy stay is immediately terminated by virtue of section 362(c)(2)(B).  All creditors, including the mortgagee (Wells Fargo), the IRS and the Borough can exercise their non-bankruptcy law rights against the debtors and their property.  In addition, Mr. Soppick would be free to continue his business operation, and his lease would not be rejected.  The debtors would also be free to seek a stay of execution from the state court system (as they improperly tried to do in May 2014) and argue their Commonwealth Court appeal.  They can also prosecute their long-pending state court product liability/personal injury action in whatever manner they believe is justified.

On balance, I conclude that the better exercise of discretion is to dismiss this case under section 1307(c).  An appropriate order will be entered to that effect, which order will also dismiss the two motions for relief from the bankruptcy stay as moot.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: August 28, 2014